# EXHIBIT B

**SUM-100**

# SUMMONS on First Amended
## (CITACION JUDICIAL)   Complaint

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**CONFORMED COPY**
**ORIGINAL FILED**
Superior Court of California
County of Los Angeles

**JAN 30 2014**

Sherri R. Carter, Executive Officer/Clerk

By D. McKINNEY, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ROBERT G. ADAMSON, III an individual; PATENT LAW WORKS, a
Limited Liability Partnership; GREG SUEOKA an individual; and DOES
3 through 10.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Font Plaza Incorporated, a Delaware Corporation

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
   Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>West - Santa Monica | CASE NUMBER:<br>*(Número del Caso):*  SC121917 |

Superior Court of California, County of Los Angeles
1725 Main Street, Santa Monica, CA 90401
The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Law Offices of Tamara M. Kurtzman, P.C.; Tamara M. Kurtzman Esq.; Justin Y. Chen, Esq.
8383 Wilshire Blvd., Ste 919, Beverly Hills, CA 90211; Tel: 323-782-6999

| DATE JAN 30 2014<br>*(Fecha)* | Sherri R. Carter, Clerk | Clerk, by<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☒ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

1  THE LAW OFFICES OF TAMARA M. KURTZMAN, P.C.
Tamara M. Kurtzman, Esq. (SBN 255258)

2  Justin Y. Chen, Esq. (SBN 293939)
8383 Wilshire Blvd., Suite 919

3  Beverly Hills, California 90211
Phone: (323) 782-6999; Fax: (323) 782-8587

4

5  Attorneys for Plaintiff, Font Plaza Incorporated

**CONFORMED COPY**
ORIGINAL FILED
Superior Court of California
County of Los Angeles

**JAN 30 2014**

Sherri R. Carter, Executive Officer/Clerk
By D. McKINNEY, Deputy

6

7  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8  FOR THE COUNTY OF LOS ANGELES

9

10  FONT PLAZA INCORPORATED, a Delaware
Corporation

11

12      Plaintiff,

13      vs.

14  ROBERT G. ADAMSON, III, an individual;
PATENT LAW WORKS, a Limited Liability

15  Partnership; GREG SUEOKA, an individual;
and DOES 3 through 10.

16

17      Defendants.

18

19

20

CASE NO. SC121917

[Hon. Lisa Hart Cole, Dept. O]

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND SPECIFIC PERFORMANCE**

1. **BREACH OF CONTRACT;**
2. **PROMISSORY ESTOPPEL;**
3. **FRAUD AND DECEIT;**
4. **NEGLIGENT MISREPRESENTATION;**
5. **BREACH OF FIDUCIARY DUTY;**
6. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**
7. **DECLARATORY RELIEF**

DEMAND FOR JURY TRIAL

21      COMES NOW, plaintiff, FONT PLAZA INCORPORATED, a Delaware Corporation who

22  complains of ROBERT G. ADAMSON, III, an individual; PATENT LAW WORKS, a Limited

23  Liability Partnership; GREG SUEOKA, an individual; and DOES 3 through 10 and alleges causes of

24  action as follows:

25  ///

26
///

27

28  ///

-1-

## INTRODUCTION

1.     This is an action brought by Font Plaza Incorporated ("Font Plaza" or the "Company") against a former director and officer of the Company, Robert G. Adamson, III ("Adamson") as well as against Greg Sueoka and his law practice, Patent Law Works, LLP.  This instant action arises out of a myriad of improper actions committed by the Defendants in connection with their various attempts to entrench themselves at the expense of the Company and its shareholders.  Specifically, Adamson's gross mismanagement of the Company and its assets, his failure to assign certain intellectual property rights to the Company as agreed, and his commission of other fraudulent acts for his own benefit have caused significant damage to the Company and its shareholders and continue to cause ongoing harm. Defendants Greg Sueoka and Patent Law Works, LLP, having full knowledge of Adamson's relationship with the Company and Adamson's commitment to assign essential intellectual property rights to the Company, intentionally sought to interfere with that agreement in order to improperly benefit themselves at the expense of the Company.  As a result of the interference of Greg Sueoka and Patent Law Works, LLP, the Company and its shareholders have likewise suffered significant harm and continue to suffer damage as a consequence of their acts.

## PARTIES

2.     Plaintiff Font Plaza is a corporation specializing in the distribution of non-standard typefaces (fonts).  Font Plaza is a Delaware Corporation with its principal place of business in Beverly Hills, California.

3.     Plaintiff is informed and believes, and thereon alleges, that Defendant Adamson is a former resident of Los Angeles, California and is currently principally residing in Draper, Utah. Adamson is the founder of Font Plaza and served as both Chairman of the Board of Directors and President of Font Plaza until his resignation in December 2013.  Furthermore, Plaintiff is informed and believes and thereon alleges that Adamson also is, and at all times herein mentioned has been, President of XMLAuthor, Inc., a business specializing in the development of Internet applications, including a mobile camera application called AfterLens.  Plaintiff is also informed and believes and thereon alleges that Adamson is, and at all times herein mentioned has been, Chief Technical Officer and a director of RainApps, Inc., a business that markets and distributes mobile device applications, including AfterLens.

1    4.    Plaintiff is informed and believes, and thereon alleges, that the true identity of Defendant

2    Doe 1 is Patent Law Works, LLP ("Patent Law Works"). Patent Law Works is a law firm specializing in

3    intellectual property representation with offices in Los Altos, California.

4    5.    Plaintiff is informed and believes, and thereon alleges, that the true identify of Defendant

5    Doe 2 is Greg Sueoka ("Sueoka").  Sueoka is an attorney licensed to practice law in the State of

6    California and is also the founder of Patent Law Works.  Plaintiff is further informed and believes and

7    thereon alleges that Sueoka is, and at all times herein mentioned has been, the managing partner of

8    Patent Law Works and in doing the things hereinafter alleged, was acting within the course and scope of

9    such agency and with the permission and consent of Patent Law Works.

10    6.    Plaintiff does not know the true names, identities, and capacities of the Defendants sued in

11    this action as Does 3 through 10, inclusive.  Plaintiff is informed and believes and on that basis alleges

12    that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein

13    alleged and proximately caused Plaintiff's damages.  Plaintiff is further informed and believes and

14    thereon alleges that some or all of the said Doe Defendants are in combination, agency, or joint venture

15    relationships with the named Defendants.  Plaintiff will amend the complaint to add the true names,

16    identities, and capacities of these Defendants when such information has been discovered.

17    7.    Plaintiff is informed and believes and thereon alleges that at all times herein mentioned,

18    each of the Defendants sued in this action as Does 3 through 10 was the agent, servant, partner, joint

19    venture partner, and/or employee of each and every one of the other Defendants and, in doing the things

20    hereinafter alleged, was acting within the course and scope of such agency and with the permission and

21    consent of the other co-Defendants.

22    **JURISDICTION AND VENUE**

23    8.    This Court has jurisdiction over each party named herein because each party is either a

24    corporation that does sufficient business in California or an individual who has sufficient minimum

25    contacts with California so as to render the exercise of jurisdiction by the California courts permissible

26    under traditional notions of fair play and substantial justice.

27    9.    The claims asserted herein arise out of malfeasance and/or nonfeasance of Defendants

28    occurring within, emanating from, and/or directed to the State of California.  Parties reside and/or

-3-

1  conduct business with the State of California, and witnesses and other evidence are located within this

2  State and County of Los Angeles.  The actions taken by Defendants were purposefully directed toward

3  the State of California such that they sufficiently establish minimum contacts and jurisdiction in this

4  State.

5  **GENERAL ALLEGATIONS**

6       10.   In or about May 2006, Adamson filed United States Patent Application No. 11/443,664

7  entitled, "Allowing Operating System Access to Non-Standard Fonts in a Network Document" relating to

8  methods for allowing typefaces (fonts) that are not standard to an operating system to nonetheless be

9  used for displayed text on websites and in other documents.  On August 27, 2013, a United States patent

10  (Patent No. 8,522,127) was issued to Adamson based on the filed application (the "Patent").

11       11.   On or about September 10, 2013, Adamson traveled to Los Angeles, California, and began

12  consulting with various business and financial advisors as to business structures and opportunities best

13  suited to exploit the Patent technology.  In or about October 2013, Adamson retained the services of

14  certain advisors to assist him in the formation and initial structuring of a corporation (Font Plaza) whose

15  purpose was to utilize the Patent technology to develop an Internet database of custom non-standard

16  typefaces to which end-users could subscribe and download.

17       12.   Given the critical nature of the Patent to the proposed corporation's business prospects,

18  Adamson's advisors suggested that he retain patent counsel to generate a memorandum for investors

19  summarizing the Patent's claims and possible utilizations of the Patent technology.  Adamson agreed and

20  retained Sueoka and Patent Law Works to begin generation of such a memorandum for investors in or

21  about late October 2013.  Drafting of the memorandum would continue well into November 2013.

22  Throughout this period, however, Patent Law Works had a significant conflict of interest: at least one of

23  the largest potential infringers of the Patent's technology was also a client of Patent Law Works.  Despite

24  this conflict, Patent Law Works continued to perform services relating to the Patent and incurred a charge

25  of approximately $5,000 in connection with such services.  In fact, based on this conflict, Sueoka

26  intentionally refused to include the name of his firm's client (or any products of that client) among the

27  list of other possible Patent infringers in the memorandum prepared for Font Plaza investors.

28       13.   In early November 2013, Adamson officially incorporated Font Plaza and immediately

-4-

FIRST AMENDED COMPLAINT

1    began seeking investors and business partners. Adamson repeatedly represented to these parties that the

2    business of Font Plaza was to pursue business opportunities directly related to the exploitation of the

3    Patent. Specifically, Adamson represented Font Plaza as the lawful owner of all rights in and to the

4    Patent and that Font Plaza would utilize the Patent technology to develop a typeface database similar to

5    Adobe's Internet-based TypeKit, whereby subscribers could purchase non-standard typefaces though a

6    website interface accessible at the Company's website, "www.fontplaza.com." Adamson also repeatedly

7    represented that because the Patent's claims related specifically to the ability of devices to display non-

8    standard typefaces, most – if not all – other Internet-based typeface services infringe on rights granted

9    under the Patent. Adamson claimed that as the owner of the Patent, Font Plaza would therefore be in a

10   unique position not only to offer such services directly to end users but also to license its technology (the

11   Patent) to competing services. In his conversations with investors and business partners, Adamson also

12   repeatedly stated that Font Plaza had retained developers to begin creation of its website interface and

13   that Font Plaza was in the process of developing various plugins for leading website design and content

14   management programs whereby developers would be able to access Font Plaza's typeface database.

15   Although investors and other members of Font Plaza's Board of Directors would periodically request that

16   Adamson provide information as to the exact nature of the work being performed by these developers

17   and the cost of such development, Adamson never provided such information.

18        14.    In connection with Font Plaza's financing efforts, Adamson presented a business model to

19   investors that contemplated raising a total of $4 million in working capital through the sale of

20   approximately 4,125,000 shares of Font Plaza's common stock. These 4.1 million shares would

21   represent ownership of roughly 26% of the Company. As repeatedly represented by Adamson, the

22   primary asset of Font Plaza was the Company's intellectual property, of which the Patent was the

23   principal component. Initially, Adamson was to receive a payment of $175,000 out of the investment

24   proceeds as well as 6.5 million shares of common stock as consideration for his assignment of the Patent

25   to Font Plaza. Later, Adamson demanded that the $175,000 amount be increased to $250,000, and

26   subsequent discussions with investors reflected this increased amount among the use of proceeds. Under

27   the proposed capital structure, Adamson's 6.5 million shares would translate into an ownership interest of

28   roughly 42% of Font Plaza. In connection with Font Plaza's financing efforts, Adamson approved the

FIRST AMENDED COMPLAINT

1   forms of both a subscription agreement and escrow agreement in early November 2013, which he

2   directed be immediately distributed to various investors.

3         15.   On or about November 14, 2013, Adamson again traveled to Los Angeles, California, on

4   Font Plaza business in order to meet with several of Font Plaza's advisors and consultants as well as to

5   meet with potential investors.  While in Los Angeles, Adamson also met with potential Font Plaza

6   management candidates.

7         16.   In late November 2013, Adamson approved a term sheet relating to a potential investment

8   of up to $50 million in Font Plaza for the purpose of financing the Company's efforts to enforce various

9   rights under the Patent.  This term sheet, which Adamson directed be distributed to investors, specified

10  that all rights in and to the Patent were to be exclusively owed by and remain the sole property of Font

11  Plaza.  Based on this term sheet and on assurances that the Patent would be the exclusive property of

12  Font Plaza, investors elected to move forward in their negotiations with Font Plaza and suggested the

13  execution of a non-disclosure agreement so that additional discussions could take place on a confidential

14  basis.

15        17.   On or about December 4, 2013, the Board of Directors held its first meeting.  At that

16  meeting, Adamson was elected President of Font Plaza and Chairman of the Board.  As President of Font

17  Plaza as well as its founder, Adamson was entrusted by the Board of Directors with the responsibility to

18  oversee the establishment and development of the Company's website, domain name, and the like.

19  Unbeknownst to the Board of Directors, however, Adamson had registered the Company's domain name

20  (fontplaza.com) in his own name rather than in the name of the Company in an attempt to secure his sole

21  ability to exercise control over the website.  Moreover, the developers that Adamson purportedly engaged

22  to develop Font Plaza's website and typeface database interface were, at the same time, performing

23  services relating to Adamson's other enterprises and were paid by Adamson for both services with

24  Company funds.  Later, when Adamson resigned from Font Plaza, he did not provide the Company

25  access to its domain name (fontplaza.com) or website content, nor did Adamson provide the Company

26  with the developers' work product paid for with Company funds.

27        18.   On or about December 6, 2013, the Board of Directors held a second meeting in order to

28  discuss business strategy and to prioritize financial expenditures.  To this end, the Directors discussed

1  Font Plaza's financing efforts at length and, specifically, the need for assignment of the Patent to be the
2  Company's top priority in order to ensure that Font Plaza had assets sufficient to attract investors and
3  warrant the established financing valuation. Adamson agreed and reiterated to the Board of Directors his
4  explicit intent to imminently assign, transfer, and convey to Font Plaza all of Adamson's right, title, and
5  interest in and to the Patent, including the right to sue for past, present, and future infringement and to
6  collect all royalties and similar incomes derived from the Patent. The consideration for this assignment,
7  as agreed by Adamson and the other members of the Board of Directors, was to be $250,000 and 6.5
8  million shares of Font Plaza common stock. The Board of Directors also discussed certain
9  representations relating to the Patent that would need to be made by Adamson in connection with the
10 Patent assignment, including, among others: that no licenses or other encumbrances had been made with
11 respect to the Patent; that Adamson is the sole inventor of the Patent and holds complete title to the
12 Patent; and that the Patent had never been found to be invalid or otherwise unenforceable. In response,
13 Adamson expressed his willingness to make such representations, assured the other Directors that he was
14 indeed the sole inventor and owner of the Patent, and stated that he had never assigned the Patent or
15 otherwise granted any licenses or encumbrances relating to the Patent.

16      19.      Based upon what the Board of Directors reasonably believed to be an agreement with
17 Adamson for the assignment of the Patent, and based upon Adamson's other oral and written assurances
18 relating to the Patent, during the December 6 meeting the Directors unanimously approved the sale of up
19 to 625,000 shares of common stock to investors at a price per share of $0.80. The Board of Directors
20 also unanimously approved the establishment of an escrow account in connection with the Company's
21 financing efforts wherein investors would deposit their funds and the Company would deposit
22 corresponding stock certificates. The Directors also unanimously approved the form of the subscription
23 agreement and escrow agreement previously approved by Adamson to be used in connection with the
24 Company's financing efforts.

25      20.      In keeping with the Directors' desire to maintain financial discipline and ensure that the
26 Company's limited funds were being utilized effectively in furtherance of the Company's established
27 priorities, during the December 6 meeting, the Board of Directors also unanimously passed a resolution
28 requiring that any expense or debt exceeding $5,000 be approved by at least two officers of Font Plaza.

-7-

1    21.    Based again on Adamson's continued written and oral assurances that the Patent would

2  timely be assigned to Font Plaza for the agreed-upon consideration, Font Plaza continued to incur various

3  travel, legal, and other expenses relating to its financing efforts and in furtherance of its business

4  operations.

5    22.    On or about December 9, 2013, Adamson once again traveled to Los Angeles on Font

6  Plaza business.  While in Los Angeles, Adamson opened a bank account on behalf of Font Plaza with

7  $6,100.00 of funds borrowed from one of Font Plaza's business advisors.  While in Los Angeles,

8  Adamson also attended various meetings relating to Font Plaza's business and financing efforts.

9    23.    Unbeknownst to any of the other Directors or officers of Font Plaza, on or about December

10  11, 2013, Adamson surreptitiously attempted to secure a loan of approximately $32,000 from one of the

11  Company's business advisors for what Adamson represented to be for Font Plaza business operations.

12  Specifically, Adamson represented to the lender that a significant portion of these funds were to be used

13  to pay developers that were working on the Font Plaza website as well as to pay certain amounts to

14  Adamson himself and to Adamson's daughter.  Plaintiff is informed and believes and thereon alleges,

15  however, that Adamson's developers were working on projects for several of Adamson's other

16  enterprises in addition to Font Plaza and that Adamson intended to use the funds borrowed on behalf of

17  Font Plaza to pay, in part, for development of his other projects.

18    24.    At no time did Adamson inform any other officer or Director of the corporation of his

19  December 2013 efforts to borrow funds on behalf of Font Plaza, and at no time did Adamson receive

20  authorization by the Board of Directors to enter into any loan agreement on behalf of the Company.

21  Likewise, at no time did Adamson inform the prospective lender that the loan sought by Adamson on

22  behalf of Font Plaza had not been authorized by the Company's Board of Directors.

23    25.    On or about December 12, 2013, Adamson initiated a wire transfer of $5,600 from Font

24  Plaza's bank account in order to purportedly pay developers for work on the Font Plaza website and

25  database interface.  However, Plaintiff is informed and believes and thereon alleges that a portion of the

26  $5,600 amount sent by Adamson to his developers was used to compensate such developers for work on

27  Adamson's other personal projects unrelated to Font Plaza.

28    26.    On or about December 13, 2013, Font Plaza received commitments from two investors

-8-

1   each wishing to invest $50,000 on the terms stated in the subscription documents as approved by the

2   Board of Directors.  As Font Plaza's President, Adamson received subscription and escrow agreements

3   for execution on behalf of the Company.  Despite the fact that Adamson had previously approved the

4   subscription and escrow agreements on at least two prior occasions, when presented with these

5   agreements on or about December 13, 2013, Adamson refused to sign them.  When questioned by the

6   other officers as to why Adamson refused to sign the documents, Adamson replied that he would only

7   sign the documents after the investors gave him their funds.  Even after it was explained to Adamson that

8   only once the agreements were in place would the investors deposit funds into the escrow account and

9   that, indeed, until the escrow agreement was in place, no escrow account even existed into which the

10   investors might deposit money, Adamson remained obstinate in his refusal to execute the documents.

11       27.   In response to Adamson's refusal to sign financing documents, on or about December 17,

12   2013, Font Plaza's Board of Directors held an emergency telephonic meeting.  Following lengthy

13   discussion during that meeting, a unanimous resolution was passed stating that Adamson would

14   immediately assign the Patent to Font Plaza for consideration consisting of a promissory note and shares

15   of common stock.  It was agreed that under the terms of the promissory note, Font Plaza would pay

16   Adamson a total of $250,000 and that such sum would be payable out of the first $350,000 of financing

17   proceeds realized by Font Plaza – the first $100,000 in capital received was to be retained by the

18   Company and used for operational purposes.  It was likewise agreed that upon Adamson's execution of a

19   patent assignment agreement reasonably acceptable to the Company, Adamson would receive 3,250,000

20   shares of common stock, with the remaining 3,250,000 shares of common to be issued to Adamson upon

21   his delivery of certain other documents to Font Plaza.  At this meeting, the Board of Directors also

22   unanimously approved certain modifications to the investor subscription agreement and escrow

23   agreement to reflect Adamson's imminent assignment of the Patent to Font Plaza.  Adamson represented

24   to the Directors that upon the discussed modifications being made to the financing agreements, he would

25   immediately execute them on behalf of the Company.

26       28.   Following passage of the resolutions relating to the Patent assignment and following

27   Adamson's agreement to execute the revised investment documents on behalf of Font Plaza, Adamson

28   for the first time informed the other Directors that once the Patent was assigned to Font Plaza, AfterLens

FIRST AMENDED COMPLAINT

must be granted an exclusive license by Font Plaza to utilize the Patent technology.  At no time did Adamson inform the Directors that AfterLens was not, in fact, a corporation at all but rather only a product developed and/or distributed by RainApps, Inc. and XMLAuthor, Inc.  This is a fact that the Directors would only learn following Adamson's resignation approximately a month later.  When questioned by the other Directors as to his role with AfterLens, Adamson falsely stated that he was the sole shareholder of AfterLens.  When the other Directors expressed doubts as to the advisability of granting any license on an exclusive basis and further expressed concern over what they believed might be a self-dealing transaction with respect to Adamson and AfterLens, Adamson became enraged.  Adamson proceeded to threaten the other Directors by informing them that they would either agree to grant an exclusive license to AfterLens or else he would replace them with Directors that would grant such a license.  Although the Board of Directors refused to approve any transaction or arrangement with AfterLens at that meeting, the Directors agreed to revisit the matter once the Patent had been assigned to Font Plaza and proper due diligence had been conducted with respect to AfterLens.  Thus mollified, Adamson reiterated his commitment to Font Plaza and his agreement to immediately assign the Patent to the Company.  In fact, later that same day Adamson informed the Board of Directors via email that he had identified a new potential investor for a possible additional $50,000 investment in Font Plaza and directed that a subscription and escrow agreement be prepared for, and distributed to, such investor.

29.     Despite Adamson's previous assurances to the contrary, upon his receipt of revised subscription and escrow agreements reflecting the modifications approved by the Board of Directors at their December 17, 2013 meeting, Adamson once again refused to execute the agreements that would have allowed the $100,000 investment to take place.  Finally, on or about December 28, 2013, Adamson insisted that Font Plaza forego the $100,000 investment entirely and cease proceeding with any further financing efforts despite the fact that the Company had incurred significant expenses in furtherance of its various financing efforts by that time.  Similarly, when Adamson was presented with a patent assignment agreement and promissory note, Adamson informed the Directors that he would not agree to execute the documents or assign the Patent despite his previous express commitments to do so.

30.     All the while, unbeknownst to investors or the other Directors of Font Plaza, Adamson was making plans to avoid assigning the Patent to Font Plaza and instead intended to transfer ownership of

1   the Patent to a holding company controlled by Adamson.  Adamson then intended to have the holding

2   company license certain limited rights to Font Plaza while also granting an exclusive license to AfterLens

3   for certain applications of the Patent.  Such an arrangement would allow Adamson to realize profits not

4   only as the licensor of the Patent but also as licensee through his multiple roles in connection with

5   XML Author, Inc., RainApps, Inc., and Font Plaza.

6          31.    Plaintiff is informed and believes and thereon alleges that Sueoka and Patent Law Works

7   not only introduced the idea of this holding company arrangement to Adamson but also continued to

8   encourage Adamson to refrain from fulfilling his agreement to assign the Patent to Font Plaza.  Acting

9   well outside their professional role as attorneys, Sueoka and Patent Law Works — in furtherance of their

10  own financial gain — encouraged Adamson to monopolize unfettered ownership control over the Patent

11  in order to retain the right to grant licenses or even outright sell the Patent to clients of Patent Law

12  Works.  Plaintiff is informed and believes and thereon alleges that to this end, Sueoka represented to

13  Adamson that Sueoka would assist Adamson in soliciting clients of Patent Law Works in the Northern

14  California Silicon Valley region to license and/or purchase the Patent from Adamson.

15         32.    In late December, 2013, having learned that Adamson was refusing to accept investment

16  and that Adamson had not yet assigned the Patent to Font Plaza despite numerous explicit promises to do

17  so, one of Font Plaza's business advisors who had lent Adamson approximately $30,000 to fund Font

18  Plaza's initial operations wrote to Adamson demanding payment of amounts owed.  On or about

19  December 31, 2013, in response to a series of queries from investors and the other Directors regarding

20  the failure of Adamson to fulfill his duties and obligations to Font Plaza and in an attempt to evade

21  liability for debts incurred by him, Adamson resigned as both an officer and Director of the Company.

22         33.    Following Adamson's resignation, Font Plaza learned for the first time that Adamson had

23  placed the Company's domain name, "fontplaza.com," up for auction and that Adamson is currently

24  soliciting bids from third parties for the purchase of the Company's domain name. Moreover, following

25  Adamson's resignation, Font Plaza has also learned that not only is Adamson actively soliciting investors

26  to fund the continued development of the typeface database interface developed for Font Plaza and paid

27  for with Font Plaza funds, but also that Adamson intents to proceed with the transfer the Patent into a

28  holding company under his exclusive control with the intent to obfuscate ownership of the Patent and

1   create yet another obstacle to deprive Plaintiff of the lawful recovery of its promised assets.

2                              **FIRST CAUSE OF ACTION**
3                                   **Breach of Contract**
                               **(As Against Adamson and DOES 3-10)**
4
5        34.    Plaintiff realleges and incorporates by this reference, as if restated in full, all
6   allegations contained in paragraphs 1-33.

7        35.    Defendants and Plaintiff entered into preliminary discussions in November 2013, during
8   which Adamson and Font Plaza agreed that in exchange for the assignment by Adamson of the Patent to
9   the Company, Adamson would receive $175,000 out of investment proceeds and 6.5 million shares of
10  Font Plaza common stock.  Adamson later demanded that the $175,000 amount be increased to $250,000,
11  a demand to which Font Plaza acquiesced in early December 2013.  The offer, acceptance, and
12  consideration necessary for the formation of an enforceable contract were formalized on or about
13
14  December 6, 2013, during the second meeting of the Font Plaza Board of Directors.

15       36.    The transfer by Adamson of the Patent to Font Plaza was a condition precedent to Font
16  Plaza's duty and ability to perform.  In order for Font Plaza to pay Adamson the $250,000 out of
17  investment proceeds and issue the 6.5 million shares contemplated, it would first be necessary for
18  Adamson to transfer the Patent to Font Plaza so that investors would have reason to invest in the
19  Company.  Unless Font Plaza held the rights to the Patent, there would be no investment proceeds from
20  which to pay Adamson under the terms of the deal.
21
22       37.    There were no conditions preventing Adamson from fulfilling his end of the exchange.
23  The contract required that Adamson first assign to Font Plaza his right and interest in the Patent,
24  including the right to sue for infringement and collect derivative royalties, in order for investment
25  proceeds to accumulate and for the exchange of consideration to take place.  Adamson refused to perform
26  his end of the bargain and thus did not fulfill his obligation under the contract.
27

28

38.     Adamson's refusal to fulfill his promise to assign the Patent to Font Plaza resulted in substantial harm to the corporation.  In furtherance of financing and establishing of its business operations, Font Plaza incurred significant expenses including legal costs, travel, brand development, and software development expenditures in excess of $150,000.  Had Font Plaza been aware that Adamson had no intention of fulfilling his obligations under the contract, these expenses would not have been incurred.  Moreover, as represented by Adamson on repeated occasions, Font Plaza was formed for the exclusive purpose of utilizing the Patent's unique technology, and the business of Font Plaza is premised on the use of that specific technology.  Indeed, were Font Plaza to proceed with its business as previously contemplated without acquiring rights in the Patent, Font Plaza would likely be infringing on the Patent holder's rights.  Font Plaza has no adequate legal remedy at law to enforce its agreement with Adamson to acquire rights in and to the Patent other than specific performance because damages, even if awarded, would not result in assignment to Font Plaza of the Patent.

**SECOND CAUSE OF ACTION**
**Promissory Estoppel**
**(As Against Adamson and DOES 3-10)**

39.     Plaintiff realleges and incorporates by this reference, as if restated in full, all allegations contained in paragraphs 1-33.

40.     Adamson made a clear and unambiguous promise to transfer and assign to Font Plaza his entire right and interest in the Patent, including the right to sue for infringement and collect derivative royalties.  Adamson specifically represented that he would assign the Patent to Font Plaza in early November 2013, in or about the time that he officially incorporated Font Plaza and began seeking investors.  Adamson reiterated this promise throughout December 2013, stating repeatedly that he explicitly intended to imminently assign, transfer, and convey to Font Plaza the rights, title, and interest in the Patent to the Company.  However, Adamson breached his promise when he failed to assign the Patent to Font Plaza.

-13-

41.    Adamson reasonably should have expected that Plaintiff would act in reasonable reliance upon that promise by, for example: continuing to fund the development of the Font Plaza website; continuing to incur travel and legal expenses related to financing the Company; and continuing to expend time, effort, and initial funding toward building, planning, and coordinating the Company's business operations. The Company in fact did reasonably rely on such promises by Adamson and incurred expenditures in excess of $150,000 based on such reliance.

42.    Moreover, as the business of Font Plaza is premised on use of the Patent's specific technology, the only means by which to avoid injustice against Plaintiff is to enforce Adamson's promise to assign the Patent to the Company. Mere damages are insufficient given the uniqueness of the Patent property and that Adamson's actions and intentions were founded on duplicitousness, deceit, and bad faith. Indeed, were Font Plaza to proceed with its business as previously contemplated without acquiring rights in the Patent, Font Plaza would likely be infringing on the Patent holder's rights — a fact Adamson is well aware of. Font Plaza has no adequate legal remedy at law to enforce its agreement with Adamson to acquire rights in and to the Patent other than to enforce Adamson promise because damages, even if awarded, would not result in assignment of the Patent to Font Plaza.

**THIRD CAUSE OF ACTION**
**Fraud and Intentional Deceit**
**(As Against Adamson and DOES 3-10)**

43.    Plaintiff realleges and incorporates by this reference, as if restated in full, all allegations contained in paragraphs 1-33.

44.    In early November 2013, Adamson began promising that he would assign ownership of the Patent to Font Plaza for the purpose of developing a subscription typeface database service. Adamson reiterated his explicit intent to assign, transfer, and convey the right, title, and interest in the Patent to the Company throughout December 2013.

45.    In December 2013, Adamson was elected President and Chairman of the Board of the Company. As such, Adamson had a fiduciary relationship with Font Plaza that included a duty to disclose all facts materially affecting the value or desirability of the Patent as well as business

-14-

opportunities affecting Font Plaza and the existence of any licensing commitments affecting the Patent and the terms of all such commitments.  Likewise, Adamson had a duty to refrain from making false statements and from making promises he had no intent to perform.

46.    Moreover, in an effort to induce Font Plaza to purchase the Patent and to pursue certain business opportunities utilizing the Patent technology (e.g. a licensing arrangement in connection with AfterLens), Adamson knew but failed to disclose to Plaintiff numerous critical facts with regard to the value of the Patent and the AfterLens application, including, without limitation, that:

a.     AfterLens is not, in fact, a corporation at all but rather only a product developed and/or distributed by RainApps, Inc and XMLAuthor, Inc;

b.     A commitment to grant an exclusive license for use of the Patent had previously been made by Adamson to RainApps, Inc and/or XML Author, Inc.;

c.     Adamson is not the sole shareholder of RainsApps, Inc., despite representing on numerous occasions that he was the sole owner of AfterLens; and

d.     AfterLens is a program that incorporates and utilizes third-party proprietary technology and is not, as represented by Adamson, entirely of his own invention.

47.    Moreover, Adamson knew but failed to disclose to the Company the fact that developers with whom he had a preexisting business relationship were the developers he retained to perform development services on behalf of Font Plaza and that such developers would be performing services for both Font Plaza and Adamson's other projects.

48.    Plaintiff is informed and believes and thereon alleges that Adamson knew of the falsity of his statements when made to Font Plaza or, in the very least, that Adamson acted with reckless disregard for the truth with respect to his misstatements.  Further, Plaintiff is informed and believes and thereon alleges that Adamson knew or reasonably should have known that the Company did not possess the information he failed to disclose and that Adamson knew or reasonably should have known that this information was material to the Company's decision whether to purchase the Patent and pursue opportunities relating to the Patent technology.

49.   At the time Defendants made such nondisclosures, and at the time the Company took the various actions described herein, the Company was ignorant of Defendants' nondisclosure of the true facts.  Moreover, despite his repeated representations to the contrary, Adamson possessed no actual intent to perform his promise to assign the Patent to Font Plaza.  While purposefully leading the Company and investors to believe that he would convey the Patent, Adamson withdrew a number of funds from Font Plaza's assets to pay for, in part, personal projects unrelated to Font Plaza, and Adamson attempted to secure a $32,000 loan in Font Plaza's name in order to pay himself, his daughter, and certain software developers.

50.   Font Plaza reasonably relied upon Adamson's representations and promise to assign the Patent.  Adamson was not only a founding member of Font Plaza but also served as its President and Chairman of the Board.  He also possessed exclusive control over the assignment of the Patent.  Adamson's repeated promises throughout November and December 2013, coupled with his position of authority within Font Plaza, reasonably assured the other Board members and investors that Adamson would keep his promise to transfer and convey to Font Plaza all of the rights, title, and interest in and to the Patent.

51.   Adamson ultimately refused to assign ownership of the Patent to Font Plaza despite repeated promises to do so — all the while continuing to improperly deplete Company assets and encourage further corporate expenditures.

52.   In reliance on Defendants' misrepresentations, the Company was induced to, and did incur, expenses and fees in excess of $150,000.  Had Font Plaza known the true facts, it would not have incurred expenses in furtherance of purchasing the Patent or in its various business operations.  Instead, Defendants purposefully withheld material information from Font Plaza and made promises with no intent to perform in order to induce the Company to continue to fund development of Adamson's personal projects, to pay Adamson and members of Adamson's family certain sums of money, and take the other actions herein alleged, thereby benefitting Adamson to the detriment of the Company.

53.   The aforementioned conduct of defendants is despicable and done without any reasonable justification but rather with the intention of depriving Plaintiff of its property and rights and otherwise

1  causing it injury. This despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious

2  disregard of its rights so as to justify an award of punitive damages in an amount sufficient to deter such

3  wrongful conduct in the future.

### FOURTH CAUSE OF ACTION
#### Negligent Misrepresentation
#### (As Against Adamson and DOES 3-10)

54.    Plaintiff realleges and incorporates by this reference, as if restated in full, all allegations contained in paragraphs 1-33.

55.    Defendants misrepresented to Plaintiff a number of critical material facts with respect to the Patent, its encumbrances, and the nature of various third party entities. Specifically:

a.    Adamson stated that no licenses or other encumbrances had been connected or attached to the Patent. In fact, a commitment had been made by Adamson without disclosure or permission by the Board to grant an exclusive license for use of the Patent to RainApps, Inc and/or XMLAuthor, Inc.

b.    Adamson stated that he was the "sole shareholder" of AfterLens. In fact, AfterLens is not a corporation at all but rather merely a product developed/distributed by RainApps, Inc. and/or XMLAuthor, Inc.

c.    Adamson stated that he was the sole owner and developer of AfterLens. However, AfterLens is a program that incorporates and utilizes third-party proprietary technology and is not, as represented by Adamson, entirely of his own creation.

d.    Adamson repeatedly claimed that he intended to assign all of his right in and to the Patent to Font Plaza.

56.    Adamson had no reasonable grounds for believing his representations were true when the statements were made. As the holder of the Patent, Adamson was in the best — and perhaps only — position to be aware or become aware of any encumbrances on the Patent with regard to commitments or

licensing agreements.  Furthermore, as the primary developer of the AfterLens application, Adamson had

no reasonable or even rational grounds for stating that AfterLens was a corporate entity and that he was

the sole shareholder of that entity.  Moreover, Adamson had no reasonable grounds to state that

AfterLens was a product of his sole creative efforts when he knew or reasonably should have known that

the application was based partially on third-party proprietary software.  Similarly, as sole owner of the

Patent, Adamson alone could assign the Patent to Font Plaza.

57.    Adamson intended that Plaintiff rely on his representations, knowing that the Company

would act in reliance upon them.  Based on Adamson's position within Font Plaza and his exclusive

control over the Patent, Plaintiff reasonably and justifiably relied on Adamson's misrepresentations to its

detriment, resulting in substantial harm to the Company.  The existence of an encumbrance on the Patent

has a real and material effect not only on the ability of the Patent to be licensed on terms favorable to the

Company but also on the overall value of the Patent.  Moreover, Adamson's insistence on engaging in

self-dealing and his disregard for the issues posed by conflicts of interest (i.e. his insistence on licensing

to AfterLens) damaged the company's ability to objectively value the Patent and caused expenses to be

incurred which would not have arisen had the true facts been disclosed. Moreover, the Company incurred

significant expenses in excess of $150,000 in pursuit of various business and financing opportunities

based upon Adamson's misrepresentations. Adamson's representations were a substantial factor in the

harms endured by Plaintiff.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(As Against Adamson and DOES 3-10)**

58.    Plaintiff realleges and incorporates by this reference, as if restated in full, all

allegations contained in paragraphs 1-33.

59.    By reason of Adamson's positions as an officer and/or director of Font Plaza, as well

as by reason of his ability to control the business and corporate affairs of Font Plaza, Adamson

-18-
FIRST AMENDED COMPLAINT

owed Font Plaza the fiduciary obligations of good faith, fair dealing, due care, trust, loyalty and full, candid, and adequate disclosure.  As a fiduciary, Adamson was required to use his utmost ability to control and manage Font Plaza in a fair, just, honest, and equitable manner and to act in furtherance of the best interests of Font Plaza and in the use and preservation of Font Plaza's property and assets.

60.     Adamson violated and breached his fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to Font Plaza by failing to make the agreed-upon Patent assignment and by spending money lent to Font Plaza to pay for development work unrelated to Font Plaza business.  Adamson further breached his fiduciary duties owed to Font Plaza by fraudulently inducing Font Plaza to pursue financing opportunities and expend funds in furtherance of its operations and development despite knowing the falsity of his representations and lack of disclosures.  Moreover, Adamson failed to make critical and material disclosures to the Board of Directors relating to RainApps, Inc., XMLAuthor, Inc., and AfterLens.  Adamson likewise withheld key facts impacting the value and viability of the Patent.

61.     As a direct and proximate result of Adamson's failure to perform his fiduciary obligations, Font Plaza has been and will continue to be harmed.

62.     Adamson's misconduct was not, and could not have been, an exercise of good faith business judgment.  As a direct and proximate result of Adamson's false promises, failures to disclose, active concealment, and/or misrepresentation of the true facts, Plaintiffs suffered substantial harm, including (but not limited to) damages in excess of $150,000 resulting from legal, travel, and other expenses related to the corporation's financing offers and efforts in furtherance of its business operations.

///

///

SIXTH CAUSE OF ACTION
Intentional Interference with Contractual Relations
(As Against Patent Law Works, Sueoka, and DOES 3-10)

63.     Plaintiff realleges and incorporates by this reference, as if restated in full, all allegations contained in paragraphs 1-33.

64.     Adamson and Font Plaza entered into an agreement, formalized on or about December 6, 2013, whereby Adamson agreed to assign the Patent to Font Plaza for consideration consisting of a promissory note in the amount of $250,000 plus 6.5 million shares of Font Plaza common stock.  Neither Patent Law Works nor Sueoka were parties to this agreement between Adamson and Font Plaza.

65.     Patent Law Works and Sueoka were intimately familiar with the Patent's claims and potential significant value.  In that Patent Law Works was retained by Adamson to provide an overview of the Patent specifically for investors of Font Plaza — an analysis paid for with Font Plaza funds — Sueoka knew, or reasonably should have known, of Adamson's role with Font Plaza and the existence of the agreement between Adamson and Font Plaza to assign the Patent.

66.     Despite knowledge of the agreement between Font Plaza and Adamson relating to the assignment of the Patent to Font Plaza, Sueoka nonetheless sought to interfere with and disrupt such agreement in order to see Adamson enter into licensing and/or sale agreements with clients of Patent Law Works instead.  As attorneys for other Internet technology companies that currently offer typeface products directly competitive with Font Plaza and whose products may potentially infringe upon the Patent's claims, Patent Law Works and Sueoka were in a unique position to reap financial benefit by assisting their other clients acquire rights to the Patent and thereby profit and avoid potential litigation.

67.     As a consequence of Sueoka and Patent Law Works' interference, Adamson ultimately refused to fulfill his promise to assign the Patent to Font Plaza and now seeks to transfer

FIRST AMENDED COMPLAINT

ownership of the Patent to a holding company under Adamson's control in order to be in a position

to sell and/or license the Patent to clients of Patent Law Works.

68.     In furtherance of financing and establishing of its business operations, Font Plaza

incurred significant expenses including legal costs, travel, brand development, and software

development expenditures in excess of $150,000.  Had Font Plaza been aware that Adamson would

not fulfill his obligations under the contract, these expenses would not have been incurred.

Moreover, as represented by Adamson on repeated occasions, Font Plaza was formed for the

exclusive purpose of utilizing the Patent's unique technology, and the business of Font Plaza is

premised on the use of that specific technology — a fact also known to Patent Law Works and

Sueoka.  Indeed, were Font Plaza to proceed with its business as previously contemplated without

acquiring rights in the Patent, Font Plaza would likely be infringing on the Patent holder's rights.

In the event that Adamson succeeds in selling the Patent to a client of Sueoka and Patent Law

Works, Font Plaza may well be subject to claims of infringement by one of Patent Law Works'

clients, thereby further enriching the Defendants at the expense of Font Plaza.

**SEVENTH CAUSE OF ACTION**
**Declaratory Relief**
**(As Against Adamson and Does 3-10)**

69.     Plaintiff realleges and incorporates by this reference, as if restated in full, all

allegations contained in paragraphs 1-33.

70.     An actual and substantial controversy exists between the parties with regard to the

ownership of the fontplaza.com domain (the "Domain").  The Domain was registered by Adamson for

the benefit of Font Plaza and for its use in the furtherance of its business operations and technology

licensing strategy.  Indeed, the Domain, in addition to the Patent, forms the cornerstone on which Font

Plaza's operation is based, as competing with third party services such as Adobe's TypeKit would require

a fully functional Internet website.  For fraudulent and malicious reasons, Adamson chose to register the

-21-

**FIRST AMENDED COMPLAINT**

Domain under his own name rather than that of Font Plaza despite repeated representations to the Board and to investors that Font Plaza owned the Domain and that the funds Adamson had withdrawn from corporate assets were being used to develop the website's underlying software and design. By now placing the Domain up for auction and by soliciting bids for the sale of the Domain for his own personal benefit, Adamson has demonstrated an adverse legal interest against Font Plaza for which declaratory relief is an appropriate remedy.

71.     The pending auction of the Domain by Adamson, the news of which took Plaintiff by surprise and is unquestionably against the interests of the corporation, is of sufficient immediacy and reality to justify declaratory relief. A finding affirming the rightful ownership of the Domain by Font Plaza would remove the imminent threat of Adamson attempting to sell the Domain to an outside party. As such, a judicial determination resolving this actual controversy is necessary and appropriate at this time.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief against Defendants:

1.     As to the First Cause of Action (Breach of Contract);

    a.     For judgment in favor of Plaintiff and against Defendants;

    b.     That the Court order defendant to specifically perform its obligations to assign and transfer to Font Plaza all of defendant's right, title, and interest in and to the Patent for the agreed-upon consideration of $250,000 and 6.5 million shares of Font Plaza common stock.

    c.     For compensatory damages according to proof but not less than $150,000 and prejudgment interest thereon to the extent allowable by law; and

    d.     For such other and further relief as the Court may deem proper.

2.     As to the Second Cause of Action (Promissory Estoppel);

a.     For judgment in favor of Plaintiff and against Defendants;

b.     That the Court order defendant to specifically perform its obligations to assign and transfer to Font Plaza all of defendant's right, title, and interest in and to the Patent for the agreed-upon consideration of $250,000 and 6.5 million shares of Font Plaza common stock.

c.     For compensatory damages according to proof but not less than $150,000 and prejudgment interest thereon to the extent allowable by law; and

d.     For such other and further relief as the Court may deem proper.

3.     As to the Third Cause of Action (Fraud);

a.     For judgment in favor of Plaintiff and against Defendants;

b.     That the Court order defendant to specifically perform its obligations to assign and transfer to Font Plaza all of defendant's right, title, and interest in and to the Patent for the agreed-upon consideration of $250,000 and 6.5 million shares of Font Plaza common stock.

c.     For compensatory damages according to proof but not less than $150,000 and prejudgment interest thereon to the extent allowable by law;

d.     For incidental and consequential damages in an amount to be proven at trial;

e.     For punitive and exemplary damages; and

f.     For such other and further relief as the Court may deem proper.

4.     As to the Fourth Cause of Action (Negligent Misrepresentation);

a.     For judgment in favor of Plaintiff and against Defendants;

b.     For compensatory damages according to proof but not less than $150,000 and prejudgment interest thereon to the extent allowable by law; and

c.     For such other and further relief as the Court may deem proper.

5.    As to the Fifth Cause of Action (Breach of Fiduciary Duty);

    a.    For judgment in favor of Plaintiff and against Defendants;

    b.    For compensatory damages according to proof but not less than $150,000 and prejudgment interest thereon to the extent allowable by law;

    c.    For punitive and exemplary damages to the extent permitted by law; and

    d.    For such other and further relief as the Court may deem proper.

6.    As to the Sixth Cause of Action (Intentional Interference)

    a.    For judgment in favor of Plaintiff and against Defendants;

    b.    For compensatory damages according to proof but not less than $150,000 and prejudgment interest thereon to the extent allowable by law; and

    c.    For such other and further relief as the Court may deem proper.

7.    As to the Seventh Cause of Action (Declaratory Relief);

    a.    For a declaration of the respective rights of the parties hereto with respect to the domain name "fontplaza.com," establishing the right of Font Plaza to exclusive ownership and possession of the same and adjudging that Defendants have no right, title, lien, or interest in the Domain;

    b.    For an order directing the Defendants and any registrars associated with the Domain to deliver to Font Plaza registration and possession of the Domain; and

    c.    For such other and further relief as the Court may deem proper.

///
///
///
///
///

## JURY DEMAND

Plaintiff hereby demands a jury trial.

Dated: January 30, 2014

THE LAW OFFICES OF TAMARA M.
KURTZMAN, P.C.


BY: _____

TAMARA M. KURTZMAN
JUSTIN Y. CHEN
Attorneys for Plaintiff Font Plaza Incorporated

FIRST AMENDED COMPLAINT

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| LAW OFFICES OF TAMARA M KURTZMAN, P.C. Tamara M. Kurtzman (SBN 255258); Justin Y Chen (SBN 293939) 8383 Wilshire Blvd., Suite 919 Beverly Hills, California 90211 TELEPHONE NO.: 323-782-6999   FAX NO.: 323-782-8587 ATTORNEY FOR (Name): Plaintiff Font Plaza Incorporated | CONFORMED COPY ORIGINAL FILED Superior Court of California County of Los Angeles JAN 17 2014 Sherri R. Carter, Executive Officer/Clerk By _____, Deputy A. Williams |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 1725 Main Street
MAILING ADDRESS: 1725 Main Street
CITY AND ZIP CODE: Santa Monica, CA 90401
BRANCH NAME: West - Santa Monica

CASE NAME:
Font Plaza Incorporated v. Robert G. Adamson III, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: SC121917 |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: LISA HART COLE DEPT: |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[✓] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties      d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve      e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence      f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action (specify):  6
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: January 17, 2014
Tamara M. Kurtzman, Attorney for Plaintiff
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov